2020 IL App (1st) 162635-U

THIRD DIVISION
December 30, 2020

No. 1-16-2635

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 8678 |
| | ) | |
| MANSOUR MOHAMMAD, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not abuse its discretion in denying defendant's request for a non-IPI jury instruction on eyewitness identification; (2) the trial court did not abuse its discretion in denying defendant's motion for a new trial where no violation of a motion *in limine* occurred; (3) the trial court did not err in allowing the State to present testimony of a witness's consistent identification of defendant at the scene; (4) the prosecutor's comment in rebuttal argument was proper; and (5) the use of defendant's mug shots for identification evidence was not error.

¶ 2    Following a jury trial, defendant Mansour Mohammad was convicted of first degree murder, attempted first degree murder, and aggravated discharge of a firearm. On appeal, defendant argues: (1) the trial court abused its discretion by denying defendant's request to issue

an enhanced jury instruction regarding eyewitness testimony rather than Illinois Pattern Jury Instruction (IPI) 3.15 (Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000) (hereinafter IPI Criminal 4th)); (2) he was denied a fair trial when the trial court failed to enforce its ruling on a motion *in limine*; (3) he was denied a fair trial when the State was permitted to present repetitive identification testimony; (4) the State's rebuttal argument improperly characterized defendant as a criminal; and (5) the use of defendant's mug shot erroneously implied other crimes evidence.

¶ 3      Defendant was charged by indictment with multiple counts of first degree murder, attempted first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm stemming from the July 10, 2008 shooting of Robert White, Bobby Peak, and Louis Williams which resulted in White's death and Peak's paralysis and partial blindness. Upon his convictions, the trial court subsequently sentenced defendant to the mandatory minimum of 80 years in prison. The following evidence was presented at defendant's July 2016 jury trial.

¶ 4      Bobby Peak testified that at the time of the trial he was 33 years old and was attending Chicago State University. He admitted that he had previously been convicted of unlawful use of a weapon and robbery. Peak also had a pending armed violence charge and in exchange for his testimony at defendant's trial, the State would dismiss the firearm-related charges from the armed violence and Peak would plead guilty to possession of a controlled substance and receive two years of probation.

¶ 5      In July 2008, Peak lived in South Holland, Illinois with his father. He previously lived near West 102nd Street and South Wood Street in Chicago and attended schools in the Beverly neighborhood. Robert White was a "very close childhood friend." Peak attended Morgan Park High School with White, Louis Williams, and defendant. Peak had known defendant since 1997

and they were friends. Peak identified in court during his testimony. Peak had been to defendant's house, located at 9622 South Charles Street, and described it as "the only blue house on the block." Peak knew defendant's family members, including defendant's younger brother Ishmael. Peak "fell out of contact" with defendant after high school, but never had an altercation with him.

¶ 6    In March 2008, Peak encountered defendant and two men, Ramon West and Corey Lardy, at a liquor store in the Beverly neighborhood. Peak had also attended high school with West and knew Lardy through West and defendant. Several years earlier, Peak had a falling out with Lardy. Peak started to approach defendant's vehicle, but before Peak could speak to the men, Lardy attempted to punch Peak and a fight ensued. No one else joined the fight between Peak and Lardy. During the fight, Peak stepped off a curb and broke his ankle.

¶ 7    Later, on July 5, 2008, Peak was in the Beverly neighborhood when he ran into defendant with three other men. Peak did not know the other men. Peak wanted to ask defendant about his fight with Lardy from March. Before Peak could approach the men, defendant told the men with him to back up on the porch and to "go get that thang, I'm not finna play with this n****." Peak then left and did not engage with defendant. Peak testified he was frequently in the Beverly neighborhood because he grew up there and had relatives and friends in that neighborhood, including White.

¶ 8    At approximately 10 p.m. on July 10, 2008, Peak was driving a rented Nissan Sentra with White. They picked up Williams. White was in the front passenger seat while Williams was in the back seat. Peak described it as a warm summer night with a "slight drizzle" later on. He admitted they had marijuana in the car. The men drove around the neighborhood before taking White home and were driving on South Charles Street when Peak saw defendant alone on the left

3

side of the block. Peak stated that he recognized defendant because he had known defendant since they were teenagers. The lighting was fair and he had no trouble with visibility.

¶ 9    When Peak saw defendant, he backed his car up and started a conversation. He asked defendant, "What's up?" White also asked defendant, "What's up?" Peak denied anyone in the car had a firearm that night. Defendant said, "Nothing. What's up." Peak then asked defendant "what's up with that p**** a** s***." The prosecutor asked Peak what he meant by that statement. Peak responded that he was referring to the incident from July 5 when defendant told the "guys he was with to go get this gun or go get that thang." Defense counsel then objected, which the trial court overruled. Peak stated that defendant answered him, saying "I ain't on p**** s***." According to Peak, defendant then "opened fire."

¶ 10    Peak estimated he was 10 to 15 feet from defendant when defendant began to fire a gun. Peak felt a gunshot strike his right eye. He "slumped over a little bit" and defendant fired another gunshot, which struck Peak in his left shoulder and "clavicle." During the shooting, White was trying to move the gear shift and told Peak to drive, but after he was shot, Peak was "immobilized" and "couldn't move anything." When defendant fired the gun again, both White and Williams exited the car and tried to run. Peak heard more gunshots. Peak did not see anyone else in the area.

¶ 11    Peak remained in the car until the police arrived. While he waited, he threw the bag of marijuana out of the car window. When the police arrived, Peak named defendant as the shooter and directed them to defendant's mother's house on the block. Peak was taken to Christ Hospital and remained hospitalized for "a little over three months." While in the hospital, defendant spoke with police detectives and identified defendant in a photograph as the shooter. Peak's father signed the photograph on Peak's behalf because he was unable to sign.   As a result of his

4

injuries from the shooting, Peak lost vision in his right eye and was paralyzed from the chest down.

¶ 12     On cross-examination, Peak denied knowing that White possessed marijuana and several hundred dollars in cash that night. He denied being in the neighborhood to sell marijuana. Defense counsel asked Peak, "who said something about some p**** a*** s***," and Peak answered that he did because he felt defendant "was a coward to immediately try to tell whoever he was with to go get some gun when it's – That was a cowardly move." Counsel further asked if defendant "was intimating that he was going to go get a gun?" Peak responded in the affirmative. Williams visited Peak in the hospital, but was not sure when that was.

¶ 13     Louis Williams testified that on July 10, 2008, he was with Peak and White in a car driven by Peak. Williams was in the backseat and White was in the front passenger seat. He had attended Morgan Park High School with both Peak and White. Williams also knew defendant from high school. He identified defendant in court. At around 10 p.m. that night, the men were driving south on Charles Street when he noticed defendant exit from a house. When Williams noticed defendant, he mentioned that to Peak and White. As they approached defendant, Peak stopped the car and started to talk to defendant.

¶ 14     Peak asked defendant "why did he run yesterday on some p**** s***," and defendant said, "he wasn't on no p**** s***." Williams then saw defendant fire a gun at them. He observed the gun in defendant's right hand. He estimated that the car was within 10 feet of defendant when the shooting began. Williams saw that Peak was shot in his face first, but then was shot again by defendant. He told Peak "let's go" while White was trying to move the gear shift. Williams then tapped White on the shoulder and both men opened the door and ran westbound to a driveway. Williams did not see anyone else on the street. White was to his left

5

when Williams heard another shot. He heard White react to being shot, and then saw White fall to the ground.

¶ 15    Williams continued to run up a driveway and climbed a fence. He was running toward a fire station located at West 95th Street and South Charles Street. As he was running, Williams saw a squad car and he flagged it down. He told the officers in the car that his friend had just been shot and gave them the address. The officers then drove toward that location. Williams was standing there when other officers in an unmarked police car stopped. He told them of the shooting and the officers put him in the back of the car before driving to the location of the shooting.

¶ 16    Williams then went to the Area 2 police station and spoke with police. During that interview, Williams did not identify defendant as the shooter because he did not "want to be involved with the police and the case." Williams admitted that he was testifying pursuant to a subpoena. Initially he did not appear for this case and a contempt of court order was issued against him. Williams did not come to court because he did not want to be involved.

¶ 17    A few days after the shooting, Williams spoke with White's family about the shooting and he told them defendant was the shooter. He told them because they were family friends. Williams later went to the police station a second time and spoke with the detectives. He identified defendant as the shooter because he "felt it was time to do the right thing." Williams identified defendant in a photograph at the police station. He stated on cross-examination that he identified defendant in a photo array. Williams testified that he had also identified defendant in a high school yearbook to Peak's father, who brought the yearbook to the police station. In July 2008, Williams had known defendant for about nine years and he did not have any trouble with him. He considered defendant to be an acquaintance. He admitted that he had a prior conviction

for possession of a controlled substance. Williams testified that he did not have a gun that night and no one in the car fired a weapon.

¶ 18    Officer Scott Leck testified that in July 2008 he was a Chicago police officer. At approximately 10 p.m. on July 10, 2008, he received a call of a person shot near 9605 South Charles Street. He proceeded to that location with his partner and observed a male "laying in the driveway of the residence" and who appeared to be deceased. He also observed a small silver car in front of the residence with another male inside the vehicle who was bleeding "profusely." Officer Leck asked the shooting victim who shot him and the man said, "Mohammad." The officer asked if the name was a first or last name and the man said, "Mansour." The victim told the officers that the man who shot him lived in the blue house on the street. The officer later learned the man in the car was named Bobby Peak.

¶ 19    Officer Heather Scherr, a Chicago police officer, testified that on July 10, 2008, she was on duty with her partner, Officer Raymond Wilke. They responded to a radio dispatch of shots fired at 9605 South Charles Street and were the first responders to the scene. She observed a small vehicle, a Nissan Sentra, with a person inside at the scene. The man in the car was hurt, but still able to speak. The officers called for an ambulance. Officer Scherr observed that the man had been shot and "there was a lot of blood and he was in critical condition." She learned that the man's name was Bobby Peak. Peak told the officers that he had been shot by Mansour Mohammad. When she asked where the perpetrator was, Peak told them that the man "ran to the white and blue house down the street." The officers then went to the house. Officer Scherr went to the backyard to make sure no one ran through the house. She did not observe anyone in the yard. She estimated that she was in the backyard for 5 to 10 minutes. She did not enter the house.

7

¶ 20    Officer Raymond Wilke testified consistently with Officer Scherr's testimony. At the scene of the shooting, Wilke observed a silver vehicle near 9605 South Charles Street with the driver in the car and he had been shot. He later learned the driver was Peak. Peak provided defendant's name to the officers and indicated defendant lived in a blue and white house on the same block. The officers proceeded to the house. Officer Wilke, accompanied by another police officer, knocked on the front door of the house and defendant's mother Rhonda Anderson answered the door. She gave the officers consent to search the house for defendant, but the officers did not locate him inside. Officer Wilke estimated that he was in the house for around five minutes. He did not recall looking for defendant's younger brother Ishmael.

¶ 21    Officer Jill Kolssak, a forensic investigator with the Chicago police department, was called to the scene with her partner at 9605 South Charles Street at approximately 11:40 p.m. on July 10, 2008. She walked through the scene, placed markers and then processed the car and the driveway nearby as well as a second driveway across the street. She also recorded a crime scene video. Officer Kolssak recovered four fired bullets and two fired bullet fragments from inside the Nissan Sentra at the scene. She did not recover any firearm evidence outside the vehicle. She observed a lot of broken glass from the car windows and a Gatorade bottle under the car. She also swabbed blood from one of the driveways and also recovered a bag of suspected cannabis nearby.  No firearms were recovered at the scene.

¶ 22    Mary Wong, a forensic scientist with the Illinois State Police, testified as an expert in gunshot residue (GSR) analysis. She received a t-shirt worn by White at the time of the shooting and found GSR on the top front exterior half of the shirt as well as the bottom back exterior half. These results led her to conclude that the shirt was in the vicinity of a discharged firearm. Wong testified that the results from the top of the shirt were consistent with White having been a

passenger in a small car in which multiple gunshots had been fired. She also testified that the GSR on the back of White's shirt was consistent with White being shot in the back. She was unable to render an opinion regarding whether White discharged a firearm because she did not have any samples taken from White's hands. Wong did not receive any samples from Williams's hands.

¶ 23     Aimee Stevens, a forensic scientist with the Illinois State Police, testified as an expert in firearms identification. She was assigned to analyze the recovered firearms evidence from the scene. She received four fired bullets and two fired bullet jacket fragments. Stevens found that all six bullets and fragments were .38 caliber. She concluded that three bullets were fired from one firearm, the other three were fired from a second firearm.

¶ 24     Dr. Minae Zakariya, an assistant medical examiner for Cook County, testified that he was assigned to review the original pathologist's report from White's autopsy because that pathologist was no longer with the medical examiner's office. White was shot in the left side of his back and the bullet traveled up through his lungs and heart, exiting through his chest. The cause of death was a gunshot wound to his back and the manner of death was homicide.

¶ 25     Detective Michelle Moore-Grose, a homicide detective with the Chicago police department, was assigned to the shooting on the 9600 block of South Charles Street. When she and her partner arrived at the scene, Park and White had already been taken to the hospital. The detective learned that Peak had named the individual who shot him as Mansour Mohammad and he lived on the block in a blue house. She went to the house, knocked on the door, and spoke to defendant's mother.

¶ 26     Later, Detective Moore-Grose spoke to Williams, who had returned to the shooting location and he identified himself as being the third individual in the car. Williams did not tell

the detective that he knew who the shooter was. The detective and her partner then went to Christ Hospital, where the victims had been taken. On the way to the hospital, the detectives learned that White had died from his injuries. They were unable to speak with Peak at the hospital because he was in surgery. She called White's father and asked to speak with him.

¶ 27    On July 17, 2008, Williams along with the fathers of Peak and White came to Area 2 to speak with Detective Moore-Grose and her partner. Williams told the detectives that he had not been "100 percent truthful" when he spoke with them on the night of the shooting and he knew the identity of the shooter. Williams told her that the shooter was named Mansour Mohammad and he knew the name because they had attended high school together. The men had brought a high school yearbook with them and Williams identified defendant in the yearbook. The detective then showed Williams a more recent photograph to "make sure that it was the same individual that he saw shooting that day." Williams identified defendant in the newer photograph. She did not show Williams a photo array because Williams had a photograph of defendant at that time and stated he knew defendant from high school.

¶ 28    On July 19, 2008, Detective Moore-Grose and her partner went to speak with Peak at the hospital. Peak's father was present. Peak was unable to speak, but was able to understand questions and could respond by nodding and shaking his head. She brought a photograph of the individual Peak had stated was the shooter and wanted to see if he could positively identify him. She showed him the photograph of defendant and Peak nodded yes to indicate that defendant was the shooter. Peak's father signed the photograph on his son's behalf. The detectives continued to look for defendant.

¶ 29    In October 2008, the detective visited Peak at his girlfriend's home to conduct a more thorough interview and obtain a handwritten statement in the presence of an assistant State's

Attorney (ASA). Following that interview, the police obtained an arrest warrant for defendant. She later learned defendant was in Indiana and was extradited to Illinois in April 2009.

¶ 30 On cross-examination, Detective Moore-Grose stated that bags of suspected cannabis and $197 in cash were found on White. She admitted that no GSR testing was conducted on the hands of Williams, Peak, or White. She also testified that no photo arrays were conducted with Williams and Peak. She stated that defendant's photograph was used to confirm that the person Peak named as the shooter was the individual the police had identified. Peak's statement recounted that he saw the shooter pull out one gun. Detective Moore-Grose testified that she had no reason to order GSR testing of Williams, Peak, and White.

¶ 31 The State then rested its case. Defendant moved for a directed verdict, which the trial court denied.

¶ 32 Naimah Mohammad, defendant's older sister, testified that in July 2008, she lived at 9622 South Charles Street. On July 10, 2008, she was home with her younger sister and mother. Her younger brother Ishmael also lived at that address, but defendant did not live there. Defendant lived in Indiana. At about 10 p.m. that night, Mohammad was doing dishes in the kitchen and her mother and sister were upstairs. She then heard what she "perceived to be gunshots or fireworks." She told her sister to stay away from the windows and then continued washing dishes. A short time later, she saw flashing lights from an ambulance.

¶ 33 Mohammad and her sister then went outside and walked down to the sidewalk. She could see a "commotion" on the block. A police officer approached her and asked if she lived at 9622. After she confirmed that she did, he asked who else lived at that address and she told him her mother, her sister, and her younger brother. The officer then asked what her younger brother's name was and she told him Ishmael. When she told the officer that Ishmael was at work, the

11

officer asked her to call Ishmael. She made the call, but it went to voicemail. She was then informed that there was a shooting and the police were looking for Ishmael. Mohammad said the police started "pouring in" her house and her mother allowed them to search it.

¶ 34    Mohammad admitted that defendant was younger than she was, but he was older than Ishmael. She knew White from grammar school, but she did not know Peak or Williams. White was "an associate" of defendant. She knew the police were looking for defendant after Ishmael spoke to them. Mohammad saw defendant a week before the shooting when he came to visit their mother. She did not know what defendant did when he was not in her presence and did not know if he came to Chicago at other times.

¶ 35    Dr. Geoffrey Loftus testified as an expert in eyewitness identification. He explained, "I view my primary role as an expert in these kinds of cases not to pass judgment on the perception or memory of any given witness, I believe that to be the jury's job." Rather, he tries to provide the trier of fact with "scientific information that might be relevant to their task of deciding who is right and who is wrong."

¶ 36    Dr. Loftus said that there are "two routes by which information in the original event makes its way into memory." The first route is conscious perception, where one forms "a conscious experience of what is happening," and based on that experience, one can transfer some information from the event into the memory. Pre-event information sometimes could influence one's beliefs or expectations about what happens in an event one is experiencing. The second thing that affects memory is post-event information, which is "any information that a witness has access to that is somehow relevant to the event, after the event itself is over." "[T]he bottom line result is that witnesses can and do wind up with memories that are very strong, very detailed,

very real seeming, memories that are expressed with a great deal of confidence but memories that are unbeknownst to a witness, false in potentially important ways."

¶ 37    Dr. Loftus stated that pre-event information could have influenced the driver, Peak, in that he was on the lookout for an individual and when someone showed up and began shooting, the "pre-event information in the form of the witness' expectations about who he is likely to see in this dark night could influence his perceptions of who he does see on that night." He also discussed how darkness can affect one's memory and how streetlights are not designed to fully illuminate a street which impacts a person's ability to "do anything that requires perceiving fine detail such as perceiving a person's appearance." Similarly, he noted that rain can impact the ability to see.

¶ 38    According to Dr. Loftus, the presence of a weapon on the scene would focus a person's attention to the weapon more than a benign object. He stated experiments have shown that when a weapon is present, people pay more attention to the weapon and less attention to the appearance of the person holding the weapon. Additionally, he opined that "recognizing somebody, a person you know as a person you know is faster and more efficient than making up a memory representation from scratch of a stranger, but both of these processes are subject to errors ***."

¶ 39    At the time of the shooting, there were several factors that were "detrimental in terms of a witness being able to accurately determine, perceive and memorize what was going on." He testified that it was likely that the driver "wouldn't have gotten a very good view of what the shooter looked like. Nevertheless, believing that he knows who the shooter is, he's able to use his knowledge of what the shooter looks like as post-event information." He further opined, "it was more likely a memory that he constructed after the fact based on post-event information

corresponding to his knowledge of what the person he believed the shooter looked like." When asked by defense counsel if knowing someone from high school or where he lived would factor into the memory and identification, Dr. Loftus testified that it would.

¶ 40    Regarding Williams, the back seat passenger, Dr. Loftus opined that since he was provided with the yearbook photograph, this post-event information could have been used to "reconstruct his likely, pretty hazy, incomplete memory of the actual shooter that he formed at the time of the shooting and unconsciously replace it with a stronger memory of the suspect who had been identified" based either on Williams viewing a picture or his prior knowledge of what that individual looked like.

¶ 41    On cross-examination, the prosecutor asked Dr. Loftus about the brief conversation that took place between those in the car and defendant prior to the shooting. Dr. Loftus testified, "at this point Mr. Williams believes that it was the defendant, Mr. Mohammad, who had been the shooter." Dr. Loftus acknowledged that Peak observed defendant on the street before the shooting and had a conversation before a weapon was visible. He admitted that "if it unfolded that way, then the weapon wouldn't attract attention until the time that it appeared." When asked if Peak providing the officers where defendant lived showed confidence in his identification, Dr. Loftus responded, "So what that shows is that he believes that the shooter was Mansour Mohammad and he knows Mansour Mohammad well enough to know where he lives." He also agreed that it was "a possibility" that Williams did not want to tell police who the shooter was because he did not want to be involved.

¶ 42    In the State's rebuttal, Detective Moore-Grose testified that when she went to 9622 South Charles Street, she did not encounter Naimah Mohammad. She only spoke with Rhonda Anderson and did not see two young women in the house. She was not looking for Ishmael

14

Mohammad and did not know who he was, but was looking for defendant. Detective Moore-Grose had not heard the name Ishmael Mohammad prior to trial. The State then rested in rebuttal.

¶ 43    During the jury instruction conference, the trial court denied defendant's request to give an enhanced instruction regarding eyewitness testimony, but the court did agree to defendant's request to strike one of the factors from IPI 3.15 on that topic. Following deliberations, the jury found defendant guilty of the first degree murder of White by the personal discharge of a firearm, the attempted first degree murder of Peak by the personal discharge of a firearm, and the aggravated discharge of a firearm in the direction of Williams.

¶ 44    Defendant filed a *pro se* motion for a new trial alleging ineffective assistance of counsel. Counsel also filed a motion for a new trial. The court considered and denied both motions for a new trial. At the subsequent sentencing hearing, the court sentenced defendant to the minimum for each count: 20 years plus the 25-year firearm enhancement for first degree murder; 6 years plus the 25-year firearm enhancement for attempted murder; and four years for aggravated discharge of a firearm. The sentences were required to be served consecutively for an aggregate term of 80 years.

¶ 45    This appeal followed.

¶ 46    Defendant first argues that the trial court abused its discretion by rejecting his proposed enhanced non-IPI jury instruction regarding eyewitness testimony. Specifically, defendant contends that the factors listed in IPI 3.15 are "based on an incorrect assessment of the jury's innate ability to evaluate eyewitness testimony." According to defendant, the jury instruction adopted in New Jersey is more scientifically accurate and the court abused its discretion in denying his request for that instruction. The State maintains that IPI 3.15 "accurately instructed

the jury on the weighing of eyewitness identifications" and the trial court properly gave this instruction.

¶ 47     "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). "Jury instructions should not be misleading or confusing. Their correctness depends not on whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them." *Id*. "If IPI instructions contain an applicable instruction on a subject about which the trial court determines the jury should be instructed, the trial court must use that instruction, unless the court determines that the instruction does not accurately state the law." *Id*. (citing Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013)). "[W]here a pattern instruction does not accurately state the law, Rule 451(a) authorizes the trial court to modify it." *Id*. "A non-IPI instruction should be used only if the IPIs for criminal cases do not contain an accurate instruction and if the tendered non-IPI instruction is accurate, simple, brief, impartial, and free from argument." *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 50 (citing *People v. Pollock*, 202 Ill. 2d 189, 211 (2002)).

¶ 48     "A reviewing court will reverse a circuit court's determination about what jury instructions to give only if the trial court abused its discretion." *People v. Polk*, 407 Ill. App. 3d 80, 107 (2010). "When deciding whether a circuit court abused its discretion, a reviewing court will examine the jury instructions in their entirety to determine whether they fairly, fully and comprehensively informed the jury of the relevant law." *Id*. "An abuse of discretion occurs only where the circuit court's ruling is ' "arbitrary, fanciful, or unreasonable, or where no reasonable person could take the view adopted by the trial court." ' " *Id*. at 107-08 (quoting *People v.*

*Rodriguez*, 387 Ill. App. 3d 812, 821 (2008), quoting *People v. Purcell*, 364 Ill. App. 3d 283, 293 (2006)).

¶ 49    IPI 3.15 states:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

[1] The opportunity the witness had to view the offender at the time of the offense.

[2] The witness's degree of attention at the time of the offense.

[3] The witness's earlier description of the offender.

[4] The level of certainty shown by the witness when confronting the defendant.

[5] The length of time between the offense and the identification confrontation." IPI Criminal 4th No. 3.15.

The factors set forth in IPI 3.15 are taken from the United States Supreme Court's decision in *Neil v. Biggers*, 409 U.S. 188 (1972). The Illinois Supreme Court has "held that the five factors listed in the instruction are an accurate statement of the law 'for assessing the reliability of identification testimony.' " *Polk*, 407 Ill. App. 3d at 109 (quoting *People v. Piatkowski,* 225 Ill. 2d 551, 567 (2007)).

¶ 50    During the jury instruction conference, defendant submitted a six-page non-IPI instruction used in New Jersey to instruct the jury on eyewitness identification. See Model Jury Charges (Criminal), "Identification: In-Court And Out-Of-Court Identifications" (rev. July 19, 2012). Defense counsel argued that IPI 3.15 "incorrectly states factors to consider" and that

17

"scientific research and study and publications" were counter to that with regard to memory and perception. However, the proposed non-IPI instruction offered by counsel was not "simple" or "brief," as required by Illinois courts. See *Ortiz*, 2017 IL App (1st) 142559, ¶ 50.

¶ 51    For example, the proposed non-IPI instruction included the following paragraph:

"Human memory is not foolproof. Research has revealed that human memory is not like a video recording that a witness need only replay to remember what happened. Memory is far more complex. The process of remembering consists of three stages: acquisition -- the perception of the original event; retention -- the period of time that passes between the event and the eventual recollection of a piece of information; and retrieval -- the stage during which a person recalls stored information. At each of these stages, memory can be affected by a variety of factors." *Id.*

¶ 52    This proposed instruction also directed the jury to consider "the witness's opportunity to view and degree of attention," and in reaching that assessment to further consider stress, duration, weapon focus, distance, lighting, and disguises or changed appearance. Other factors to be considered are a prior description of perpetrator and a witness's confidence and accuracy. *Id.*

¶ 53    In response to the defense's request for this instruction, the State argued that IPI 3.15 "adequately" addressed the issue and that the "proposed jury instruction [was] trying to bolster the expert who testified." In its ruling, the trial court observed that the way the proposed instruction was crafted indicated "a judicial seal of approval" of the statements made by Dr. Loftus. The court further found:

"It's the law that Dr. Loftus can testify and discuss those issues in an effort for the jury to gauge the efficacy of the identification, those factors are not

18

the law. It may well be that the jury would not believe Dr. Loftus, it may well be that they will. But for the Court to state that these factors ought to be considered by them would be the equivalent of me putting my stamp of approval on that particular witness' testimony and that I am not going to do."

¶ 54    However, the court did grant defendant's request to modify IPI 3.15 and so the fourth *Biggers* factor regarding the certainty of the identification was omitted over the State's objection. Nevertheless, defendant asserts that IPI 3.15 "did not adequately cover the factors associated with eyewitness identifications."

¶ 55    Defendant relies on *People v. Lerma*, 2016 IL 118496, for support. In that case, the supreme court recognized that scientific research concerning the reliability of eyewitness identifications is "well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." In *Lerma*, the defendant filed a pretrial motion *in limine* to allow Dr. Loftus, the same expert who testified for the defense in the instant case, to testify as an expert on the topic of memory and eyewitness identification. *Id.* ¶ 8. The defendant's motion stated the expert would identify and explain "several 'common misperceptions' that exist concerning the accuracy and reliability of eyewitness identifications." *Id.* The expert's testimony would include "the following scientifically documented findings, all of which are beyond the common knowledge of the average layperson: that the witness's level of confidence does not necessarily correlate to the accuracy of the identification; that numerous factors can undermine the accuracy of an eyewitness's identification, including the stress of the event itself, the presence of a weapon, the passage of time, the 'forgetting curve,' the wearing of partial disguises such as hoods, exposure to postevent information, nighttime viewing, and suggestive police identification procedures; that eyewitnesses tend to overestimate time frames; and that cross-

racial identifications tend to be less reliable than same-race identifications." *Id*. The trial court denied the defendant's motion. *Id*. ¶ 10. The supreme court found the case before it was "the type of case for which expert eyewitness testimony is both relevant and appropriate" because the State's case rested "100% on the reliability of its eyewitness identifications" and "several of the factors [the expert] identified as potentially contributing to the unreliability of eyewitness testimony *** are either present or possibly present in this case." *Id*. ¶ 26. The *Lerma* court held the trial court abused its discretion because it denied the defendant's request "to present relevant and probative testimony from a qualified expert that speaks directly to the State's only evidence against him, and [did] so for reasons that are both expressly contradicted by the expert's report and inconsistent with the actual facts of the case." *Id*. ¶ 32.

¶ 56    Defendant argues that the science of eyewitness identification that the supreme court acknowledged in *Lerma* supports his position that IPI 3.15 is outdated. However, the supreme court in *Lerma* did not address IPI 3.15, and the court's decision was limited to the issue of allowing expert testimony. Here, the trial court properly followed *Lerma* and allowed Dr. Loftus to present expert testimony on the issue of eyewitness identification.

¶ 57    To support his argument for this "enhanced" instruction, defendant also relies extensively on out-of-state authority, namely *State v. Henderson*, 27 A.3d 872 (N.J. 2011) and *Commonwealth v. Gomes*, 22 N.E.3d 897 (Mass. 2015), neither of which are binding on this court. *People v. Sullivan*, 366 Ill. App. 3d 770, 781 (2006).

¶ 58    In *Henderson*, the New Jersey Supreme Court reviewed of a court-appointed special master's recommendations about the factors that many experts believe impact a witness's ability to identify the perpetrator of a crime. Based on these recommendations, the court delineated a list of factors that trial courts may consider when assessing suggestiveness and reliability.

*Henderson*, 27 A.3d at 920-21. The issue before the *Henderson* court concerned the reliability of an eyewitness identification obtained during a police photo array. *Id*. at 880-82. The court conducted an extensive review of scientific research, including a consideration of how memory works. *Id*. at 892-914. Ultimately, the court ordered a revision of the jury instruction on eyewitness identification. *Id*. at 925-26. The jury instruction on eyewitness identification was revised in 2012. See Model Jury Charges (Criminal), "Identification: In-Court And Out-Of-Court Identifications" (rev. July 19, 2012).

¶ 59     Similar to defendant's claim here, in *Gomes*, the defendant in that case alleged the trial court had erred by giving the model jury instruction rather than the defendant's requested instruction on eyewitness identification. The Massachusetts Supreme Judicial Court found no error in the trial court's decision and affirmed the defendant's convictions. *Gomes*, 22 N.E.3d at 899-900. However, the *Gomes* court took the "opportunity to revisit [its own] jurisprudence regarding eyewitness identification jury instructions in general." *Id*. at 905. After reviewing a report compiled by "the Supreme Judicial Court Study Group on Eyewitness Evidence" it previously had convened to explore the issue, the court in *Gomes* proposed "a new provisional jury instruction" incorporating five "generally accepted principles" about eyewitness identification it found to have been established through scientific research.

¶ 60     While we have reviewed these out-of-state decisions, courts in Illinois have not departed from the *Biggers* factors as set forth in IPI 3.15. As previously cited, the Illinois Supreme Court in *Piatkowski* affirmed the use of the *Biggers* factors to evaluate eyewitness testimony. See *Piatkowski*, 225 Ill. 2d at 567. Further, our appellate courts continue to consistently apply the *Biggers* test for eyewitness identification. See, *e.g.*, *People v. Thompson*, 2020 IL App (1st)

21

171265, ¶ 42; *People v. Luellen*, 2019 IL App (1st) 172019, ¶ 59; *People v. Blankenship*, 2019 IL App (1st) 171494, ¶ 27.

¶ 61    Moreover, unlike the supreme courts in New Jersey and Massachusetts, our supreme court in *Lerma* did not take the opportunity to address whether the IPI instruction remained an accurate statement of the law in Illinois, nor did it order a study into the continued use of this instruction. *Lerma* was decided subsequent to both *Henderson* and *Gomes*. Further, while defendant suggests that the *Lerma* court "looked to" *Henderson* in its decision, the only citation to *Henderson* was in the statement of facts where the defendant had cited the case in a pretrial motion. *Lerma*, 2016 IL 118496, ¶ 12.

¶ 62    Therefore, while the landscape of the law on the reliability of eyewitness identifications evolves, the *Biggers* test remains the law in Illinois, and as such, the trial court was required to instruct the jury with IPI 3.15. See Ill. S. Ct. R. 451(a). Accordingly, we find no abuse of discretion in the trial court's decision to deny defendant's request for the non-IPI instruction.

¶ 63    Next, defendant contends that the trial court erred by failing to enforce its ruling on a motion *in limine* regarding speculation that defendant referred to a gun during a prior interaction with Peak and, therefore, abused its discretion in denying defendant's motion for a new trial. The State maintains that the trial court did not abuse its discretion.

¶ 64    "A motion *in limine* permits a party to obtain a pretrial order excluding inadmissible evidence and protecting the moving party from the prejudicial impact of any mention of the evidence in front of the jury." *People v. Gliniewicz*, 2018 IL App (2d) 170490, ¶ 32. A trial court's ruling on a motion *in limine* "is always subject to reconsideration during trial." *People v. Drum*, 321 Ill. App. 3d 1005, 1008 (2001).

¶ 65      Prior to trial, defendant filed a motion *in limine* asking to bar evidence of the encounter between Peak and defendant on July 5, 2008, five days before the shooting. The State asked to allow Peak to testify about his interaction with defendant and that defendant told another person to "go get that thang." The State agreed that it would not ask Peak what he thought defendant meant by that statement. The trial court allowed the testimony based on the State's representation that it would not elicit testimony that Peak believed defendant was referring to a gun.

¶ 66      At trial, Peak testified that when he saw defendant on July 10, 2008, he asked defendant "what's up with that p**** a** s***?" The prosecutor asked Peak, "What did you mean by that?" Peak responded, "The incident from the night before when he telling his --- whatever guys he was with to go get his gun or go get that thang." Defense counsel objected, which the trial court overruled.

¶ 67      Later during cross-examination, defense counsel also asked Peak about that remark, and Peak stated that he was "[f]eeling that [defendant] was a coward to immediately try to tell whoever he was with to get some gun ***." Counsel later asked whether defendant was "intimating that he was going to get a gun?" Peak responded in the affirmative.

¶ 68      In his posttrial motion, defendant argued he was denied a fair trial based on Peak's testimony which was introduced in violation of the ruling on the motion *in limine*. After hearing arguments, the trial court denied defendant's motion and specifically addressed this claim.

> "But whether it was through direct or cross, it was of no moment to me
> because I don't believe that it was done by the State with intention or in
> purposeful dereliction of the Court's ruling. I don't even believe that it was
> negligently done because I think Peak just kind of blurted it out. And, frankly, the
> statement, Go get that thing, is difficult of any other interpretation in the context

23

of the evidence presented, so that I don't believe it was prejudicial in any event and led to an unfair result on trial, particularly in light of the compelling identification testimony presented by Peak and Williams, which was made by Peak at that particular time when he was in the agony of a paralyzing gunshot, and made by Williams under circumstances that easily credited the jury's determination that he and Peak were telling the truth."

¶ 69    After reviewing the trial transcripts, we find no abuse of discretion by the trial court. The State did not violate the court's ruling on the motion *in limine*. Peak's testimony about the July 5 confrontation was properly admitted to show the background that led to the shooting and why Peak asked defendant about that encounter. The motion *in limine* only excluded Peak's interpretation that defendant's statement to "go get that thang," was referring to a gun. The State did not ask a question to elicit testimony in violation of the order. Rather, the State asked Peak what he meant when he said, "what's up with that p**** a** s***?" The prosecutor was not asking about the July 5 encounter, but was asking about Peak's statement moments before defendant produced a firearm and began to fire on July 10th. We agree with the trial court's assessment that Peak "blurted out" that he believed defendant was referring to a gun. Defense counsel objected to that testimony, but the court overruled the objection. Sometime after this objection, during his own cross-examination, defense counsel asked Peak several questions about Peak's reference to a gun. Under the invited error doctrine, a party cannot complain of an error on appeal that he either brought about, participated in, or to which he acquiesced. *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 39 (citing *People v. Hughes*, 2015 IL 117242, ¶ 33). Additionally, the State did not use this testimony at any other time during the trial. Since the State did not elicit testimony in violation of the motion *in limine*, defense counsel used it

extensively in his own cross, and the State did not emphasize this utterance again, the trial court did not abuse its discretion in denying defendant's motion for a new trial on this basis.

¶ 70    Defendant next argues that he was denied a fair trial because the State was allowed to present overly repetitive testimony about Peak's identification of defendant immediately following the shooting. The State responds that it properly introduced Peak's identification through multiple witnesses because identification was defendant's primary defense at trial.

¶ 71    Peak testified that defendant was the shooter and identified him in court at trial. Then, multiple responding officers testified that Peak identified defendant by name and described his mother's house on the block. Officers Scherr and Wilke were partners and both testified about Peak's identification. Then Officer Leck testified that he asked Peak who shot him and Peak provided defendant's name. Detective Moore-Grose did not speak with Peak at the scene, but testified that she learned from an officer that Peak had identified defendant as the shooter and based on that information, she searched for defendant at his mother's house.

¶ 72    "Generally, a witness's prior consistent statements are inadmissible to corroborate the trial testimony of that witness because they serve to unfairly enhance the witness's credibility." *People v. Temple*, 2014 IL App (1st) 111653, ¶ 34. "However, this rule does not apply to statements of identification." *Id*. "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 73    Here, defendant asserts that the testimony regarding Peak's identification was cumulative and its prejudicial effect outweighed its substantive value. However, as the State points out, defendant contested Peak's identification of defendant at trial, and therefore, Peak's immediate and consistent identification was relevant to corroborate the identification. The defense

repeatedly challenged and attempted to cast doubt on Peak's identification through Dr. Loftus's testimony as well as defendant's sister who testified that the police initially asked about defendant's brother Ishmael as a suspect. Since identification was contested at trial, the trial court acted within its discretion to allow the testimony of the police officers regarding Peak's identification of defendant at the scene of the shooting. Accordingly, defendant's claim fails.

¶ 74 Next, defendant contends that the prosecutor's statement during rebuttal closing argument deprived him of a fair trial. Specifically, defendant asserts that the prosecutor improperly argued that defendant was a "criminal" and suggested the fact that defendant was on trial was proof of guilt and shifted the burden of proof. The State maintains that the single comment was proper and in response to defense counsel's argument.

¶ 75 Generally, a prosecutor is given wide latitude in closing arguments, although his or her comments must be based on the facts in evidence or upon reasonable inferences drawn therefrom. *People v. Page*, 156 Ill. 2d 258, 276 (1993). "During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses." *People v. McGee*, 2015 IL App (1st) 130367, ¶ 56. Moreover, "closing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). "Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009).

¶ 76 "In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Wheeler*, 226 Ill. 2d at 123. "Prosecutorial

misconduct warrants reversal only if it 'caused substantial prejudice to the defendant, taking into account the content and context of the comment, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial.' " *People v. Love*, 377 Ill. App. 3d 306, 313 (2007) (quoting *People v. Johnson*, 208 Ill. 2d 53, 115 (2004)). "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Wheeler*, 226 Ill. 2d at 123. "The trial court may cure errors by giving the jury proper instructions on the law to be applied; informing the jury that arguments are not themselves evidence and must be disregarded if not supported by the evidence at trial; or sustaining the defendant's objections and instructing the jury to disregard the inappropriate remark." *Simms*, 192 Ill. 2d at 396-97.

¶ 77    During closing arguments, defense counsel argued repeatedly that Peak and Williams were convicted felons and unworthy of belief. Counsel began with, "What they are really asking you to do is take the word of two convicted felons, Peak and Williams, and to resolve all doubts in their favor." Counsel then argued,

> "And it's only fairness to say that we don't resolve the doubts [in] favor of the criminals. We don't resolve the doubts in favor of a Bobby Peak or a Louis Williams because that's just common sense, that's everyday common sense. We don't hire felons in our places of employment, we do background checks to make sure that they don't come and try to work around money and cash registers. We certainly don't hire them to watch our children because they are not reliable, they are not trustworthy and that's who these people are.

> *** And the State would like you to resolve the doubt in the two felons

27

who had a rented car, perhaps they wanted to go on a block, create some trouble and not be recognized, no ID and two cell phones. What's that about"

¶ 78    Counsel later continued,

"Perhaps there was a gun firing in that car that Louis Williams fired past Bobby Peak at that shooter that they don't want to talk about. Perhaps that explains Louis Williams not wanting to talk to police that night, not wanting to give a name, not wanting to go to a police station, not wanting to be questioned closely about what they have [been] doing out there. Perhaps that explains his willingness once he's talked to Bobby Peak at the hospital and finds out oh, no, the police are just treating us like victims, it's safe to talk, we should give them a name, let's give them Mansour, we'll give them Mansour. Perhaps that explains what's going on.

And if you have a doubt about that, if that's a possibility, if that's the motive of that man, the criminal that they brought before you as their witness, if that's a motivating factor for him, if that's a possibility, that's a reasonable doubt."

¶ 79    In rebuttal, the prosecutor responded to this argument.

"Counsel says don't resolve those issues on behalf of Bobby Peak and Louis Williams because they are criminals. This guy is the criminal. He is on trial. Bobby Peak is not on trial. Louis Williams is not on trial. What she's suggesting is that if anybody has a felony conviction, have a good day, shoot them all you want."

Defense counsel objected on the basis that this comment misstated the argument, but the trial

28

court overruled the objection.

¶ 80    The State contends that this objection was not contemporaneous to the complained-of comment, *i.e.*, "This guy is the criminal. He is on trial," but instead was in response to the subsequent comment. Defendant also failed to specifically challenge this comment in his posttrial motion. Defendant's posttrial motion offered only a general challenge to the State's closing arguments, "The Assistant State's Attorney made prejudicial inflammatory and erroneous statements in closing argument designed to arouse the prejudices and passions of the jury, thereby prejudicing the defendant's right to fair trial," and later, specifically contended, "The Court permitted improper rebuttal argument which mischaracterized the defense position as, If anybody has a felony conviction, have a good day, shoot them all you want." Even if we presume counsel's objection at trial was in reference to the now complained-of comment, defendant did not specifically challenge this comment in his posttrial motion. To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). Nevertheless, defendant asks this court to review this claim for plain error if we find that he did not preserve the issue on appeal.

¶ 81    Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is

29

so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565 (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). However, the plain error rule "is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather, the supreme court has held that the plain error rule is a narrow and limited exception to the general rules of forfeiture. *Id.*

¶ 82    Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant asserts that this alleged error in the rebuttal argument would qualify as a plain error under both prongs. However, "[t]he initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 83    When the complained-of comment is viewed in context, we find the comment was a proper response to defense counsel's repeated arguments that Peak and Williams were untrustworthy because they had prior felony convictions as well as the specific reference to Williams as a "criminal." The prosecutor's comment, "This guy is the criminal. He is on trial. Bobby Peak is not on trial. Louis Williams is not on trial," was not an attempt to shift the burden of proof. Rather, the comment was intended to remind the jury that Peak and Williams were victims and defendant was the perpetrator charged with the offenses. There was no suggestion that defendant had prior criminal convictions in this statement. We find no error in the comment which was a proper response to defense counsel's closing argument.

¶ 84    Defendant next contends the State was allowed to improperly introduce evidence of other crimes through the use of mug shot photos. Specifically, defendant contends that both Peak and

Williams identified defendant in photographs provided by police that were easily identifiable as mug shots. However, defendant concedes that he forfeited this issue by failing to object at trial or raise it in a posttrial motion. He asks this court to review this claim under the plain error doctrine.

¶ 85    As stated above, the plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565 (citing *Herron*, 215 Ill. 2d at 186-87). Defendant asserts that this alleged error would qualify under either prong. However, again, under either prong of the plain error doctrine, we begin by determining whether there was an error. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 86    At trial, both Peak and Williams identified defendant in photographs provided by the police. These witnesses identified defendant in different photographs. According to defendant, "although the photos were not clearly labeled as mug shots, the style and composition of the photos did not allow for any other interpretation."

¶ 87    Other crimes evidence "is generally not admissible to show a defendant's guilt because the jury may convict the defendant only because it feels he is a bad person deserving of punishment." *People v. Meeks*, 382 Ill. App. 3d 81, 88-89 (2008). "Evidence of other crimes in which a defendant may have participated is not admissible to show the defendant's propensity to commit crime. Such evidence, however, is admissible if relevant for any other purpose such as *modus operandi,* proof of motive, intent, identification, or absence of mistake." *People v.*

31

*Coleman*, 158 Ill. 2d 319, 333 (1994).

¶ 88    The supreme court explained in *People v. Arman*, 131 Ill. 2d 115, 123 (1989), that testimony relating to the use of mug shots in an investigation may be introduced to show how a defendant was initially linked to the commission of an offense when identification is a material issue at trial. "A police photograph is admissible to show the reasonableness of a witness' identification that the offender and the person depicted are the same." *People v. Sims*, 285 Ill. App. 3d 598, 607 (1996). "While mug shot evidence should not be admitted if it tends to inform a jury of a defendant's commission of other, unrelated criminal acts, the erroneous admission at trial of mug shot evidence suggesting the defendant's involvement in unrelated offenses does not automatically warrant reversal." *People v. Rodriguez*, 312 Ill. App. 3d 920, 929 (2000).

¶ 89    We find defendant's reliance on *Arman* to support his claim that the mug shots constituted inadmissible other crimes evidence to be misplaced. In *Arman*, a police detective testified that a photograph came from the Chicago police department's identification files. While the court found this testimony was evidence of other crimes and should not have been admitted, the *Arman* court concluded that any error was not prejudicial where the trial court sustained an objection and instructed the jury to disregard the detective's statement. *Id*. at 123-24.

¶ 90    In contrast, defendant does not argue that a trial witness testified that the photographs were mug shots or were retrieved from a police database. No such testimony was presented. Detective Moore-Grose offered no testimony indicating where she obtained the photographs, nor did she suggest defendant had a prior arrest record. Further, there was no testimony to suggest that defendant had a prior arrest record.

¶ 91    Rather, defendant is asserting that the mere use of a mug shot is prejudicial other crimes evidence. Illinois Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an

"[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). It is well-settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff v. Dever*, 194 Ill. App. 3d 147, 155-56 (1990). Arguments unsupported by citation to relevant legal authority are considered as forfeited on appeal. *Id*. Defendant has failed to cite any relevant authority to support his argument that the use of mug shot for identification purposes without any testimony regarding the source of the photo is inadmissible other crimes evidence.

¶ 92      Since the mug shots were admitted at trial as evidence of identification, we find no error. As discussed throughout this decision, the identification of the shooter was a significant issue at trial. The trial testimony established that both Peak and Williams identified defendant in separate police provided photographs. No improper testimony was elicited relating to where the police obtained the photographs or defendant's prior arrest record. Because no error occurred, there was no plain error. See *People v. Johnson*, 218 Ill. 2d 125, 139 (2005) ("Clearly, there can be no plain error if there is no error").

¶ 93      Finally, defendant argues that the cumulative effect of his alleged errors deprived him of a fair trial. However, since we have found no errors occurred at the trial, there can be no cumulative error. See *People v. Caffey*, 205 Ill. 2d 52, 118 (2001) (where no error occurred at all, or any error that may have occurred did not rise to the level of plain error, the defendant was not entitled to a new trial on the basis of cumulative error).

¶ 94      Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 95    Affirmed.