2023 IL App (1st) 211302-U

SECOND DIVISION
November 7, 2023

No. 1-21-1302

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 8678 |
| | ) | |
| MANSOUR MOHAMMAD, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in summarily dismissing defendant's *pro se* postconviction petition because his appellate counsel was not ineffective for failing to raise meritless claims on direct appeal that (1) he was wrongfully convicted based on inconsistent verdicts; (2) the State knowingly used perjured testimony; and (3) his sentence was unconstitutional.

¶ 2    Defendant Mansour Mohammad appeals *pro se* from the trial court's first stage dismissal of his postconviction petition, arguing that his petition sufficiently set forth the gist of his constitutional claims. Specifically, he contends that: (1) he was wrongfully convicted based on inconsistent verdicts; (2) the prosecution knowingly permitted and relied on perjured testimony;

(3) his 80-year sentence is unconstitutional because the firearm enhancements were not based on a guilty verdict by the jury and are disproportionate to his sentences on the predicate offenses; and (4) his appellate counsel was ineffective for failing to raise these claims on direct appeal.

¶ 3    Following a July 2016 jury trial, defendant was convicted of first degree murder, attempted first degree murder, and aggravated discharge of a firearm and subsequently sentenced to the mandatory minimum of 80 years in prison. Defendant's convictions arose out of the July 10, 2008 shooting of Robert White, Bobby Peak, and Louis Williams which resulted in White's death and Peak's paralysis and partial blindness.

¶ 4    The pertinent evidence presented at defendant's jury trial was the following.

¶ 5    Bobby Peak testified that he previously lived near West 102nd Street and South Wood Street in Chicago and attended schools in the Beverly neighborhood. Robert White was a "very close childhood friend." Peak attended Morgan Park High School with White, Louis Williams, and defendant. He was frequently in the Beverly neighborhood because he grew up there and had relatives and friends in that neighborhood, including White. Peak had known defendant since 1997 and they were friends. Peak identified defendant in court during his testimony. Peak had been to defendant's house, located at 9622 South Charles Street, and described it as "the only blue house on the block." Peak knew defendant's family members, including defendant's younger brother Ishmael. Peak "fell out of contact" with defendant after high school, but never had an altercation with him.

¶ 6    In March 2008, Peak encountered defendant and two men, Ramon West and Corey Lardy, at a liquor store in the Beverly neighborhood. Peak had also attended high school with West and knew Lardy through West and defendant. Several years earlier, Peak had a falling out with Lardy. Peak started to approach defendant's vehicle, but before Peak could speak to the

men, Lardy attempted to punch Peak and a fight ensued. No one else joined the fight between Peak and Lardy. During the fight, Peak stepped off a curb and broke his ankle.

¶ 7    Later, on July 5, 2008, Peak was in the Beverly neighborhood when he ran into defendant with three other men. Peak did not know the other men. Peak wanted to ask defendant about his fight with Lardy from March. Before Peak could approach the men, defendant told the men with him to back up on the porch and to "go get that thang, I'm not finna play with this n****." Peak then left and did not engage with defendant.

¶ 8    At approximately 10 p.m. on July 10, 2008, Peak was driving a rented Nissan Sentra with White and Williams. White was in the front passenger seat while Williams was in the back seat. Peak described it as a warm summer night with a "slight drizzle" later on. He admitted they had marijuana in the car. The men drove around the neighborhood before taking White home and were driving on South Charles Street when Peak saw defendant alone on the left side of the block. Peak stated that he recognized defendant because he had known defendant since they were teenagers. The lighting was fair, and he had no trouble with visibility.

¶ 9    When Peak saw defendant, he backed his car up and started a conversation. He asked defendant, "What's up?" White also asked defendant, "What's up?" Peak denied anyone in the car had a firearm that night. Defendant said, "Nothing. What's up." Peak then asked defendant "what's up with that p**** a** s***," referring to the incident from July 5. Peak stated that defendant answered him, saying "I ain't on p**** s***." According to Peak, defendant then "opened fire."

¶ 10    Peak estimated he was 10 to 15 feet from defendant when defendant began to fire a gun. Peak felt a gunshot strike his right eye. He "slumped over a little bit" and defendant fired another gunshot, which struck Peak in his left shoulder and "clavicle." During the shooting, White was

3

trying to move the gear shift and told Peak to drive, but after he was shot, Peak was "immobilized" and "couldn't move anything." When defendant fired the gun again, both White and Williams exited the car and tried to run. Peak heard more gunshots. Peak did not see anyone else in the area.

¶ 11   Peak remained in the car until the police arrived. Peak identified defendant to the police by name as the shooter and directed them to defendant's mother's house on the block. Peak was taken to Christ Hospital and remained hospitalized for "a little over three months." While in the hospital, he spoke with police detectives and identified defendant in a photograph as the shooter. Peak's father signed the photograph on Peak's behalf because he was unable to sign.   As a result of his injuries from the shooting, Peak lost vision in his right eye and was paralyzed from the chest down.

¶ 12   Louis Williams testified that on July 10, 2008, he was with Peak and White in a car driven by Peak. Williams was in the backseat and White was in the front passenger seat. He had attended Morgan Park High School with both Peak and White and also knew defendant from high school. He identified defendant in court.

¶ 13   At around 10 p.m. that night, the men were driving south on Charles Street when he noticed defendant exit from a house. When Williams noticed defendant, he mentioned that to Peak and White. As they approached defendant, Peak stopped the car and started to talk to defendant. Peak asked defendant "why did he run yesterday on some p**** s***," and defendant said, "he wasn't on no p**** s***." Williams then saw defendant fire a gun at them. He observed the gun in defendant's right hand. He estimated that the car was within 10 feet of defendant when the shooting began.

¶ 14    Williams saw that Peak was shot in his face first and then was shot again by defendant. He told Peak "let's go" while White was trying to move the gear shift. Williams then tapped White on the shoulder and both men opened the door and ran westbound to a driveway. Williams did not see anyone else on the street. White was to his left when Williams heard another shot. He heard White react to being shot, and then saw White fall to the ground.

¶ 15    Williams continued to run toward a fire station located at West 95th Street and South Charles Street. As he was running, Williams saw a squad car and he flagged it down. He told the officers in the car that his friend had just been shot and gave them the address. The officers then drove toward that location. Williams was standing there when other officers in an unmarked police car stopped. He told them of the shooting and the officers put him in the back of the car before driving to the location of the shooting.

¶ 16    Williams then went to the Area 2 police station and spoke with police. During that interview, Williams did not identify defendant as the shooter because he did not "want to be involved with the police and the case." A few days after the shooting, Williams spoke with White's family about the shooting and he told them defendant was the shooter. He told them because they were family friends. Williams later went to the police station a second time and spoke with the detectives. He identified defendant as the shooter because he "felt it was time to do the right thing." Williams identified defendant in a photograph at the police station. He stated on cross-examination that he identified defendant in a photo array. Williams testified that he had also identified defendant in a high school yearbook to Peak's father, who brought the yearbook to the police station. In July 2008, Williams had known defendant for about nine years and he did not have any trouble with him. He considered defendant to be an acquaintance.

¶ 17    Chicago Police Officer Scott Leck received a call of a person shot near 9605 South Charles Street at approximately 10 p.m. on July 10, 2008. He proceeded to that location with his partner and observed a male "laying in the driveway of the residence" who appeared to be deceased. He also observed a small silver car in front of the residence with another male inside the vehicle who was bleeding "profusely." Officer Leck asked the shooting victim who shot him and the man said, "Mohammad." The officer asked if the name was a first or last name and the man said, "Mansour." Officer Leck's partner was taking notes and asked the man to spell Mansour, which the man did. The victim told the officers that the man who shot him lived in the blue house on the street. The officer later learned the man in the car was named Bobby Peak.

¶ 18    Officer Heather Scherr, a Chicago police officer, testified that on July 10, 2008, she was on duty with her partner, Officer Raymond Wilke. They responded to a radio dispatch of shots fired at 9605 South Charles Street and were the first responders to the scene. She observed a small vehicle, a Nissan Sentra, with a person inside at the scene. The man in the car was hurt, but still able to speak. The officers called for an ambulance. Officer Scherr observed that the man had been shot and "there was a lot of blood and he was in critical condition." She learned that the man's name was Bobby Peak. Peak told the officers that he had been shot by Mansour Mohammad. When she asked where the perpetrator was, Peak told them that the man "ran to the white and blue house down the street." The officers then went to the house. Officer Scherr went to the backyard to make sure no one ran through the house. She did not observe anyone in the yard. She estimated that she was in the backyard for 5 to 10 minutes. She did not enter the house.

¶ 19    Officer Raymond Wilke testified consistently with Officer Scherr's testimony. At the scene of the shooting, Wilke observed a silver vehicle near 9605 South Charles Street with the driver in the car and he had been shot. He later learned the driver was Peak. Peak provided

defendant's name to the officers and indicated defendant lived in a blue and white house on the same block. The officers proceeded to the house. Officer Wilke, accompanied by another police officer, knocked on the front door of the house and defendant's mother Rhonda Anderson answered the door. She gave the officers consent to search the house for defendant, but the officers did not locate him inside. Officer Wilke estimated that he was in the house for around five minutes. He did not recall looking for defendant's younger brother Ishmael.

¶ 20    Detective Michelle Moore-Grose, a homicide detective with the Chicago police department, was assigned to the shooting on the 9600 block of South Charles Street. When she and her partner, Detective Tom Shebish, arrived at the scene, Peak and White had already been taken to the hospital. The detective learned that Peak had named the individual who shot him as Mansour Mohammad, and he lived on the block in a blue house. She went to the house, knocked on the door, and spoke to defendant's mother.

¶ 21    Later, Detective Moore-Grose spoke to Williams, who had returned to the shooting location and he identified himself as being the third individual in the car. Williams did not tell the detective that he knew who the shooter was. On July 17, 2008, Williams, along with the fathers of Peak and White, came to Area 2 to speak with Detective Moore-Grose and her partner. Williams told the detectives that he had not been "100 percent truthful" when he spoke with them on the night of the shooting and he knew the identity of the shooter. Williams told her that the shooter was named Mansour Mohammad and he knew the name because they had attended high school together. The men had brought a high school yearbook with them and Williams identified defendant in the yearbook. The detective then showed Williams a more recent photograph to "make sure that it was the same individual that he saw shooting that day." Williams identified defendant in the newer photograph. She did not show Williams a photo array

7

because Williams had a photograph of defendant at that time and stated he knew defendant from high school.

¶ 22    On July 19, 2008, Detective Moore-Grose and her partner went to speak with Peak at the hospital. Peak's father was present. Peak was unable to speak, but was able to understand questions and could respond by nodding and shaking his head. She brought a photograph of the individual Peak had stated was the shooter and wanted to see if he could positively identify him. She showed him the photograph of defendant and Peak nodded yes to indicate that defendant was the shooter. Peak's father signed the photograph on his son's behalf. The detectives continued to look for defendant.

¶ 23    After the State rested its case, defendant moved for a directed verdict, which the trial court denied.

¶ 24    Naimah Mohammad, defendant's older sister, testified that in July 2008, she lived at 9622 South Charles Street. On July 10, 2008, she was home with her younger sister and mother. Her younger brother Ishmael also lived at that address, but defendant lived in Indiana. At about 10 p.m. that night, Naimah was doing dishes in the kitchen and her mother and sister were upstairs. She then heard what she "perceived to be gunshots or fireworks." She told her sister to stay away from the windows and then continued washing dishes. A short time later, she saw flashing lights from an ambulance.

¶ 25    Naimah and her sister then went outside and walked down to the sidewalk. She could see a "commotion" on the block. A police officer approached her and asked if she lived at 9622. After she confirmed that she did, he asked who else lived at that address and she told him her mother, her sister, and her younger brother. The officer then asked what her younger brother's name was and she told him Ishmael. When she told the officer that Ishmael was at work, the

officer asked her to call Ishmael. She made the call, but it went to voicemail. She was then informed that there was a shooting and the police were looking for Ishmael. Naimah said the police started "pouring in" her house and her mother allowed them to search it.

¶ 26    Naimah admitted that defendant was younger than she was, but he was older than Ishmael. She knew White from grammar school, but she did not know Peak or Williams. White was "an associate" of defendant. She knew the police were looking for defendant after Ishmael spoke to them.

¶ 27    Dr. Geoffrey Loftus testified as an expert in eyewitness identification. He tries to provide the trier of fact with "scientific information that might be relevant to their task of deciding who is right and who is wrong." Dr. Loftus said that there are "two routes by which information in the original event makes its way into memory." The first route is conscious perception, where one forms "a conscious experience of what is happening," and based on that experience, one can transfer some information from the event into the memory. Pre-event information sometimes could influence one's beliefs or expectations about what happens in an event one is experiencing. The second thing that affects memory is post-event information, which is "any information that a witness has access to that is somehow relevant to the event, after the event itself is over."

¶ 28    Dr. Loftus stated that pre-event information could have influenced the driver, Peak, in that he was on the lookout for an individual and when someone showed up and began shooting, the "pre-event information in the form of the witness' expectations about who he is likely to see in this dark night could influence his perceptions of who he does see on that night." According to Dr. Loftus, the presence of a weapon on the scene would focus a person's attention to the weapon more than a benign object. Regarding Williams, Dr. Loftus opined that since he was provided with the yearbook photograph, this post-event information could have been used to

9

"reconstruct his likely, pretty hazy, incomplete memory of the actual shooter that he formed at the time of the shooting and unconsciously replace it with a stronger memory of the suspect who had been identified" based either on Williams viewing a picture or his prior knowledge of what that individual looked like.

¶ 29    The prosecutor asked Dr. Loftus about the brief conversation that took place between those in the car and defendant prior to the shooting. Dr. Loftus testified, "at this point Mr. Williams believes that it was the defendant, Mr. Mohammad, who had been the shooter." Dr. Loftus acknowledged that Peak observed defendant on the street before the shooting and had a conversation before a weapon was visible. He admitted that "if it unfolded that way, then the weapon wouldn't attract attention until the time that it appeared." When asked if Peak providing the officers where defendant lived showed confidence in his identification, Dr. Loftus responded, "So what that shows is that he believes that the shooter was Mansour Mohammad and he knows Mansour Mohammad well enough to know where he lives."

¶ 30    In the State's rebuttal, Detective Moore-Grose testified that when she went to 9622 South Charles Street, she did not encounter Naimah. She only spoke with Rhonda Anderson and did not see two young women in the house. She was not looking for Ishmael Mohammad and did not know who he was, but was looking for defendant. Detective Moore-Grose had not heard the name Ishmael Mohammad prior to trial. The State then rested in rebuttal.

¶ 31    Following deliberations, the jury found defendant guilty of the first degree murder of White by the personal discharge of a firearm, the attempted first degree murder of Peak by the personal discharge of a firearm, and the aggravated discharge of a firearm in the direction of Williams.

¶ 32    Defendant filed a *pro se* motion for a new trial alleging ineffective assistance of counsel. Counsel also filed a motion for a new trial. The court considered and denied both motions for a new trial. At the subsequent sentencing hearing, the court sentenced defendant to the minimum for each count: 20 years plus the 25-year firearm enhancement for first degree murder; 6 years plus the 25-year firearm enhancement for attempted murder; and four years for aggravated discharge of a firearm. The sentences were required to be served consecutively for an aggregate term of 80 years.

¶ 33    On direct appeal, defendant argued: (1) the trial court abused its discretion by denying defendant's request to issue an enhanced jury instruction regarding eyewitness testimony rather than Illinois Pattern Jury Instruction (IPI) 3.15 (Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000) (hereinafter IPI Criminal 4th)); (2) he was denied a fair trial when the trial court failed to enforce its ruling on a motion *in limine*; (3) he was denied a fair trial when the State was permitted to present repetitive identification testimony; (4) the State's rebuttal argument improperly characterized defendant as a criminal; and (5) the use of defendant's mug shot erroneously implied other crimes evidence. This court rejected defendant's claims and affirmed his convictions and sentence. *People v. Mohammad*, 2020 IL App (1st) 162635-U, ¶ 94.

¶ 34    In June 2021, defendant filed his *pro se* postconviction petition, raising multiple claims, including that (1) his conviction was based on inconsistent verdicts regarding the first degree murder conviction, (2) the prosecution knowingly relied on perjured testimony that the police were not looking for his younger brother Ishmael, (3) his sentence was unconstitutional because the firearm enhancements were not proven guilty beyond a reasonable doubt and the firearm enhancements were longer than his principal sentence for the predicate offenses, and (4) his appellate counsel was ineffective for failing to raise these claims on direct appeal.

¶ 35    In September 2021, the trial court dismissed defendant's petition as frivolous and patently without merit in a 36-page written order. The court found defendant forfeited all of these claims because they were available to be asserted on direct appeal but were not. Despite the forfeiture, the court held that all of the claims lacked merit. Specifically, the court reasoned that defendant's claim of legally inconsistent verdicts failed because the two murder charges did not contain the same essential elements. The court also rejected defendant's perjury claim because it was "nothing more than a bald conclusion" that Detective Moore-Grose gave perjured testimony regarding her knowledge of his brother Ishmael. The court further held that defendant's proportionate penalties challenge was "simply incorrect" because he received the mandatory minimum sentences and the enhancements were properly added to his first degree murder and attempted first degree murder sentences. The court also observed that the jury found defendant personally discharged a firearm beyond a reasonable doubt. Finally, the court found that defendant's ineffective assistance of appellate counsel failed because defendant was not prejudiced by counsel's decision not to raise these nonmeritorious claims.

¶ 36    On appeal, defendant argues that the trial court erred in dismissing his postconviction petition at the first stage because he set forth claims showing that he was convicted in violation of his constitutional right to due process. Specifically, he contends that: (1) his conviction was based on inconsistent verdicts because he was found both guilty and not guilty of the same elements of first degree murder; (2) the prosecution knowingly used and relied on perjured testimony regarding his brother Ishmael as a suspect; (3) his 80-year sentence is unconstitutional because the firearm enhancements were not based on a guilty verdict by the jury and are disproportionate to his sentence on the predicate offenses; and (4) his appellate counsel was ineffective for failing to raise these claims on direct appeal. Defendant has not challenged the

remaining claims presented in his petition on appeal and has therefore forfeited those claims. *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal); see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 37 The Post-Conviction Act (the Act) (725 ILCS 5/122-1 through 122-8 (West 2018)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2018); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *People v. English*, 2013 IL 112890, ¶ 22.

¶ 38 At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018). "A postconviction petition is frivolous or patently without merit when its allegations, taken as true and liberally construed, fail to present the gist of a constitutional claim." *People v. Harris*, 224 Ill. 2d 115, 126 (2007). A petition is

frivolous or patently without merit only if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacks an arguable basis in law or fact if it is "based on an indisputably meritless legal theory," such as one that is "completely contradicted by the record," or "a fanciful factual allegation," including "those which are fantastic or delusional." *Id.* at 16-17. Pursuant to section 122-2, the defendant must attach to his petition "affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2012). "This low threshold does not excuse the *pro se* petitioner from providing factual support for his claims; he must supply sufficient factual basis to show the allegations in the petition are 'capable of objective or independent corroboration.' " *People v. Allen*, 2015 IL 113135, ¶ 24 (quoting *People v. Collins*, 202 Ill.2d 59, 67 (2002)).

¶ 39    If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2018). At the dismissal stage of a postconviction proceeding, the trial court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would necessitate relief under the Act. *Coleman*, 183 Ill. 2d at 380. The circuit court is not permitted to engage in any fact-finding or credibility determinations. *Id.* at 385. We are to accept well-pleaded factual allegations of a postconviction petition and its supporting evidence as true unless they are positively rebutted by the record of the original trial proceedings. *Id.* at 382. We review the summary dismissal of defendant's petition *de novo. People v. Tate*, 2012 IL 112214, ¶ 10.

¶ 40    We observe that *pro se* litigants, such as defendant, are not entitled to more lenient treatment than attorneys. "[W]here a defendant elects to proceed *pro se,* he is responsible for his representation and is held to the same standards as any attorney." *People v. Richardson*, 2011 IL

14

App (4th) 100358, ¶ 12. Additionally, a *pro se* litigant must comply with the rules of procedure required of attorneys. *People v. Vilces*, 321 Ill. App. 3d 937, 940 (2001).

¶ 41    The State asserts that defendant has forfeited his first three claims by failing to raise them on direct appeal. See *English*, 2013 IL 112890, ¶ 22. However, the State acknowledges that defendant has contended that his appellate counsel was ineffective for failing to raise these claims on direct appeal. The doctrine of forfeiture may be relaxed where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record. *Id.* Since defendant has alleged ineffective assistance of appellate counsel, he has not forfeited his claims.

¶ 42    Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 43    "The *Strickland* standard applies equally to claims of ineffective appellate counsel, and a defendant raising such a claim must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010). "Appellate counsel is not

obligated to brief and argue every conceivable issue on appeal, and a defendant cannot claim prejudice based on appellate counsel's failure to raise an issue that is not meritorious." *People v. Pingelton*, 2022 IL 127680, ¶ 64. "If the underlying claim would not have succeeded on direct appeal, then 'there is no arguable legal basis' for defendant's claim of ineffective assistance of appellate counsel, and dismissal is 'proper.' " *People v. Randall*, 2021 IL App (1st) 191194, ¶ 66 (quoting *Petrenko*, 237 Ill. 2d at 501-02).

¶ 44     At the first stage of postconviction proceedings, a petition alleging ineffective assistance of counsel may not be dismissed if: (1) counsel's performance arguably fell below an objective standard of reasonableness; and (2) the petitioner was arguably prejudiced as a result. *Hodges*, 234 Ill. 2d at 17. "To adequately plead a claim of ineffective assistance of counsel, the petition must satisfy both prongs of the test." *People v. Bush*, 2022 IL App (1st) 210509, ¶ 31 (citing *Hodges*, 234 Ill. 2d at 17).

¶ 45     Here, defendant first argues that the jury's guilty verdict on one count of first degree murder is legally inconsistent with the jury's not guilty verdict on a second count of first degree murder. He contends that both counts of first degree murder contained the same essential elements and the jury by its verdicts found these elements were "found both to exist and not exist."

¶ 46     During jury instructions, the trial court referred to "Type A and Type B" to distinguish between different counts of first degree murder. For Type A, the court instructed the jury that the State must prove: (1) defendant performed the acts which caused White's death, and (2) when he did so, defendant intended to kill or do great bodily harm to White or knew that his acts created a strong probability of death or great bodily harm to White. For Type B, the court instructed the jury that the State must prove: (1) the defendant performed the acts which caused the death of

White; and (2) when the defendant did so, he was committing the offense of attempted first degree murder of Peak. Following deliberations, the jury found defendant guilty of Type A first degree murder and not guilty of Type B first degree murder.

¶ 47     Over 20 years ago, the Illinois Supreme Court foreclosed defendant's argument in *People v. Jones*, 207 Ill. 2d 122, 130 (2003). There, our supreme court elected to follow the United States Supreme Court's decision in *United States v. Powell*, 469 U.S. 57, 63 (1984), which held that "consistency in the verdicts is not required as a matter of constitutional law and that inconsistent verdicts can often be explained as a product of juror lenity." The *Powell* Court further noted that where jury verdicts are inconsistent, it is unclear which side has benefited and that a defendant was still protected from a wrongful conviction because he or she retained the ability to challenge the sufficiency of the evidence. *Powell*, 469 U.S. at 465-67. Following *Powell*, our supreme court held that: "Defendants in Illinois can no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges." *Jones*, 207 Ill. 2d at 133-34; see *People v. Alexander*, 2017 IL App (1st) 142170, ¶ 38 (adhering to the holding in *Jones* to foreclose the defendant's argument that the jury's not guilty verdict on a special interrogatory was inconsistent with the guilty verdict on a first degree murder charge). Based on the Illinois Supreme Court's holding in *Jones*, defendant's claim of inconsistent verdicts, based on one guilty verdict and one acquittal, lacks merit. Accordingly, his appellate counsel was not ineffective for failing to raise this claim on direct appeal.

¶ 48     Next, defendant contends that the prosecution knowingly permitted, used, and relied on perjured testimony. Specifically, defendant argues that Detective Moore-Grose gave false testimony when she stated in rebuttal that defendant's brother Ishmael was not a suspect and she had never heard his name before trial. Defendant maintains that the State knowingly permitted

17

this perjured testimony, failed to correct it, and relied on it to obtain a "tainted conviction." The State responds that defendant's claim is "completely frivolous and patently without merit" because Peak "repeatedly identified defendant, not his younger brother Ishmael, as the shooter in the minutes immediately after he was shot." The State further asserts that "[t]his fact was overwhelmingly established by the trial testimony of Peak and three responding officers who witnessed his detailed and unequivocal identifications of defendant."

¶ 49    It is well established that the State's knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict." *Id.* (citing *United States v. Bagley,* 473 U.S. 667, 678-80 (1985)). However, "[a] witness's testimony constitutes perjury only if the witness knowingly makes a false statement." *People v. Pulgar*, 323 Ill. App. 3d 1001, 1010 (2001). To establish a constitutional violation cognizable under the Act, there must be "an allegation of knowing use of false testimony." *People v. Brown*, 169 Ill. 2d 94, 106 (1995). A witness commits perjury if he or she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Inconsistencies in testimony cannot be equated with perjury, nor does it establish or show that the State knowingly used perjured testimony. *People v. Craig*, 334 Ill. App. 3d 426, 439 (2002). The burden of proving that the State knowingly used perjured testimony lies with the defendant. *Id.*

¶ 50    Defendant focuses primarily on his sister Naimah's testimony and the State's rebuttal testimony of Detective Moore-Grose. In her testimony, Naimah recounted the events

immediately following the shooting. When she and her sister went outside after the shooting, she saw a "commotion" on the block. She was approached by a police officer asking her whether she lived at 9622. After she confirmed that she did, the officer asked her who else lived at that address and she told him her mother, her sister, and her younger brother. The officer then asked what her younger brother's name was and she told him Ishmael. When she told the officer that Ishmael was at work, the officer asked her to call Ishmael. She made the call, but it went to voicemail. She was then informed that there was a shooting, and the police were looking for Ishmael. Naimah admitted that defendant was younger than she was, but he was older than Ishmael. She later knew the police were looking for defendant after Ishmael spoke to them.

¶ 51    In rebuttal, the State recalled Detective Moore-Grose to the witness stand. When she went to defendant's mother's house, she did not see Naimah and spoke only with defendant's mother. Detective Moore-Grose testified that she was not looking for Ishmael Mohammad and did not know who he was, but was looking for defendant. She had not heard the name Ishmael Mohammad prior to trial.

¶ 52    According to defendant, Detective Moore-Grose's rebuttal testimony was false and constituted perjured testimony. In support of his claim, he relies on three police documents attached to his postconviction petition. Defendant points to handwritten notes on the general progress report from the detective division, dated July 11, 2008. Towards the bottom of the page, the name "Mohammad, Ismail" is handwritten with the date "19 Sep 85." Defendant asserts that the date is Ishmael's date of birth, but nothing was attached to the petition to support this assertion. The bottom of the page has a space for the "reporting officer signature" and the first signature is the last name "Shebish," below that is the signature of "Moore." Detective Shebish worked with Detective Moore-Grose on July 10, 2008. A second general progress report, dated

July 10, 2008, was signed only by "Shebish" and has a notation written in cursive that appears to read: "Maszor Ishmal Mohamd." Defendant also attached the second page from the Chicago police department event query, dated April 27, 2009. The page lists events in chronological order occurring on July 10, 2008, beginning at 10:19 p.m. through 10:36 p.m. At 10:21 p.m., the text stated, "OFFENDER MONSUER MAHI." A few minutes later at 10:25, another entry stated, "MOHAMMED ISHMAEL 2004 TOYOTA CAMRY 22 YOA (OFFENDER)."

¶ 53    We find that none of these documents arguably establish that Detective Moore-Grose falsely testified that she was not investigating Ishmael the night of the shooting. As previously observed, the defendant must attach to his petition "affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2012). "[T]he purpose of section 122-2 is to establish that a petition's allegations are capable of 'objective or independent corroboration.' " *People v. Delton*, 227 Ill. 2d 247, 254 (2008) (quoting *People v. Hall,* 217 Ill.2d 324, 333 (2005)). The attached documents do not satisfy the pleading requirements of section 122-2 of the Act.

¶ 54    Defendant, tellingly, did not include the full documents, but only individual pages. The event query specifically stated that it was page 2, but no other pages have been attached. Defendant has not explained why the other page or pages of the event query were not attached. Nor has defendant disclosed if the two general progress reports were the only general progress reports completed in the police investigation. Further, these documents consist of brief handwritten notations in the two general progress reports and brief entries in the event query. While Detective Moore-Grose's signature appears on one of the general progress reports, her partner's signature appears on both, and it is unknown which detective wrote Ishmael's name on the reports. We find that the mere notation of Ishmael's name does not support defendant's

conclusion that the police considered Ishmael a suspect. We find that these partial documents fail to arguably show that Detective Moore-Grose knew of Ishmael and then knowingly gave false testimony to the contrary. Here, the overwhelming identification evidence at trial clearly showed that defendant was the named suspect from the very start of the police investigation. Further, any claim that the police were looking for anyone other than Mansour Mohammad is completely contradicted by the record. See *Hodges*, 234 Ill. 2d at 16. (A petition lacks an arguable basis in law or fact if it is "based on an indisputably meritless legal theory," such as one that is "completely contradicted by the record").

¶ 55    At trial, Peak testified that defendant was the shooter and identified him in court at trial. Peak stated that he identified defendant by name and described defendant's mother's house to responding officers, which was corroborated by the testimony of multiple officers. Officers Scherr and Wilke were partners, and both testified about Peak's identification. Officer Wilke testified that he did not recall looking for Ishmael after the shooting. Then Officer Leck testified that he asked Peak who shot him, and Peak provided defendant's name. Officer Leck further stated that his partner asked Peak to spell defendant's name, which Peak did. Detective Moore-Grose did not speak with Peak at the scene, but testified that she learned from an officer that Peak had identified defendant as the shooter and based on that information, she searched for defendant at his mother's house. A week after the shooting, Williams spoke with Detective Moore-Grose and her partner at Area 2 and he named Mansour Mohammad as the shooter. He knew defendant's name because they had attended high school together and he identified defendant in a high school yearbook that had been brought to the station. Detective Moore-Grose then showed Williams a more recent photograph to "make sure that it was the same individual that he saw shooting that day," and Williams identified defendant.

21

¶ 56    Notably, all four of the police officers that testified at trial gave consistent testimony regarding Peak's identification of defendant by name. None of the officers indicated that they were looking for another suspect or that defendant's brother Ishmael was considered a suspect in the shooting. Further, Naimah admitted in her testimony that after police later spoke with Ishmael, she knew the police were looking for defendant.

¶ 57    After reviewing all the trial evidence alongside defendant's allegations, we find that defendant has failed to arguably demonstrate that Detective Moore-Grose knowingly gave false testimony and that the prosecutors knew or should have known of this false testimony. As previously stated, a conviction obtained by the knowing use of perjured testimony will be set aside only if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *Olinger*, 176 Ill. 2d at 345. Defendant has not shown that the alleged false testimony arguably would have affected the jury's verdict. Even if we were to assume that Detective Moore-Grose's rebuttal testimony was knowingly false, which we do not find, the verdict would not have been affected because of the overwhelming evidence of defendant's identification as the shooter. As discussed above, Peak identified defendant by name immediately after the shooting to multiple police officers. Peak knew defendant from high school and had recent encounters with defendant prior to the shooting. He spoke to defendant on the street before defendant pulled out a gun and fired into the car. Williams also identified defendant as the shooter. Multiple police officers corroborated Peak's identification. Naimah also admitted that after police spoke with Ishmael, she knew they were looking for defendant.

¶ 58    Further, defendant's own prior arguments demonstrate he knew that he was the only suspect in the shooting. First on direct appeal, he argued that he was denied a fair trial because the State presented repetitive testimony regarding Peak's identification of defendant immediately

following the shooting. Second, defendant contended in his posttrial *Krankel* hearing that he wanted to present a defense of self-defense, conceding he was at the scene and fired the gun, but his trial counsel decided to pursue an identity defense. Accordingly, defendant has not set forth an arguable claim of the knowing use of perjured testimony and this claim fails. Since this claim lacks merit, appellate counsel was not ineffective for failing to raise this claim on direct appeal.

¶ 59    Lastly, defendant raises multiple claims alleging that his sentence is unconstitutional. Defendant first asserts that his 80-year sentence is unconstitutional because the jury did not render a guilty verdict for the firearm enhancements to his sentence. According to defendant, the verdict forms for the sentencing enhancements did not comply with section 115-4(o) of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115-4(o) (West 2012)) because the forms did not require the jury to find him guilty or not guilty of personally discharging a firearm. Defendant's claim fails for two reasons.

¶ 60    First, the special verdict forms submitted to the jury followed the Illinois Pattern Jury Instructions (IPI) and defendant did not object or offer an alternative instruction before the trial court. "As a general rule, where an appropriate IPI instruction exists on a subject upon which the trial court has determined the jury should be instructed, the IPI must be used." *People v. Pollock*, 202 Ill. 2d 189, 212 (2002). "Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." *People v. Herron*, 215 Ill. 2d 167, 175 (2005).

¶ 61    Defendant was subject to mandatory sentencing enhancements because the jury found he personally discharged a firearm that proximately caused the death of another person, White, and proximately caused the permanent disability of another person, Peak. Defendant was

subsequently sentenced to 20 years plus the 25-year firearm enhancement for first degree murder and 6 years plus the 25-year firearm enhancement for attempted murder. The special verdict forms the jury received for the firearm enhancements adhered to Illinois Pattern Jury Instructions Nos. 28.05 and 28.06. IPI Criminal 4th, Nos. 28.05 and 28.06. No objection was raised to the use of these instructions, nor were alternative instructions requested by defendant. Thus, this claim was forfeited.

¶ 62    Second, forfeiture aside, defendant's claim fails because the jury considered whether the aggravating allegations that defendant personally discharged a firearm had been proven beyond a reasonable doubt. Defendant cites *Alleyne v. United States*, 570 U.S. 99 (2013), to assert the facts of the sentencing enhancement constituted a separate offense and there was no guilty finding. His reliance on *Alleyne* is misplaced.

¶ 63    In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the United States Supreme Court held "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Alleyne* extended this rule to facts which increase the mandatory minimum sentence for an offense. *Alleyne*, 570 U.S. at 114-15. Thus, under *Apprendi* and *Alleyne*, the jury had to find the facts of the sentencing enhancement, *i.e.*, that the defendant personally discharged the firearm that killed White and permanently disabled Peak, beyond a reasonable doubt.

¶ 64    Here, the jury found that the State proved beyond a reasonable doubt that defendant personally discharged a firearm that caused the death of White and permanently disabled Peak. The court properly instructed the jury that the enhancement allegation must be proven beyond a reasonable doubt. The jury signed the verdict forms for both enhancements finding the allegations were proven beyond a reasonable doubt that defendant personally discharged a

24

firearm causing death and permanent disability, respectively. Thus, the trial court proceedings fully complied with *Apprendi* and *Alleyne* and the court properly sentenced defendant to the mandatory firearm enhancements. Since the jury found the allegations for the sentencing enhancements were proven beyond a reasonable doubt, his appellate counsel was not ineffective for failing to raise this claim on direct appeal.

¶ 65    Defendant also contends in one sentence that the charging instruments failed to notify him that he was "charged with violating 730 ILCS 5/5-8-1(a)(1)(a)." While defendant mistakenly cited the wrong section for the firearm sentencing enhancement, his indictments clearly alleged the sentencing enhancement, and this claim is without merit.

¶ 66    Under section 111-3(c-5) of the Code,

> "if an alleged fact (other than the fact of a prior conviction) is not an element of an offense but is sought to be used to increase the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for the offense, the alleged fact must be included in the charging instrument or otherwise provided to the defendant though a written notification before trial, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt." 725 ILCS 5/111-3(c-5) (West 2010).

"The statute calls for inclusion of the alleged fact in the charging instrument *or* written notification; if the indictment includes the alleged fact used as a basis for enhancement, no additional written notification is required." (Emphasis in original.) *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 60. Section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections provides: "if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death

to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010).

¶ 67    Here, defendant was charged by indictment and was subsequently convicted on count 23 for first degree murder and count 38 for attempted first degree murder. Count 23 stated that defendant:

> "committed the offense of FIRST DEGREE MURDER in that HE, WITHOUT LAWFUL JUSTIFICATION, INTENTIONALLY OR KNOWINGLY SHOT AND KILLED ROBERT WHITE WITH A FIREARM, AND DURING THE COMMISSION OF THE OFFENSE, HE PERSONALLY DISCHARGED A FIREARM THAT PROXIMATELY CAUSED DEATH."

Similarly, count 38 stated that defendant:

> "committed the offense of ATTEMPT FIRST DEGREE MURDER in that HE, WITHOUT LAWFUL JUSTIFICATION, WITH INTENT TO KILL, DID AN ACT, TO WIT: SHOT AT BOBBY PEAK WHILE ARMED WITH A FIREAM, WHICH CONSTITUTED A SUBSTANTIAL STEP TOWARD THE COMMISSION OF THE OFFENSE, HE PERSONALLY DISCHARGED A FIREARM THAT PROXIMATELY CAUSED PERMANENT DISABILITY, TO BOBBY PEAK."

¶ 68    Both counts clearly complied with section 111-3(c-5) by alleging the facts to support the sentencing enhancement. Since defendant was properly informed in the indictment, this claim fails and his appellate counsel was not ineffective for failing to raise this claim on direct appeal.

¶ 69    Finally, defendant argues that his sentence violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because the firearm enhancement sentences

exceed his sentences for the predicate offenses. As previously stated, defendant received a sentence of 20 years for first degree murder plus the 25-year firearm enhancement and a sentence of 6 years for attempted murder plus the 25-year firearm enhancement.

¶ 70    Initially, the State asserts that defendant has forfeited this argument by failing to develop any reasoned argument with citation to relevant authority. Illinois Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). " '[A] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.' " *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88 (quoting *In re Marriage of Auriemma,* 271 Ill. App. 3d 68, 72 (1994), quoting *Thrall Car Manufacturing Co. v. Lindquist,* 145 Ill. App. 3d 712, 719 (1986)). Contentions supported by some argument, but no authority do not meet the requirements of Supreme Court Rule 341(h)(7). *Id.* As previously observed, a defendant proceeding *pro se* is responsible for his representation and will be held to the same standards as an attorney. *Richardson*, 2011 IL App (4th) 100358, ¶ 12. As pointed out above, a *pro se* party must comply with the rules of procedure required of attorneys. *Vilces*, 321 Ill. App. 3d at 940.

¶ 71    Here, defendant's argument consists of three conclusory paragraphs with general reference citations to the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. He does not cite any case law in support or set forth any reasoned argument. He states the basic facts of his sentence terms, observes that the enhancement is greater than the underlying offense, and concludes that his

sentence is unconstitutional. This brief argument does not meet the requirements of Rule 341(h)(7) and has been forfeited on appeal.

¶ 72    Despite the forfeiture, defendant's proportionate penalties claim lacks merit and the trial court properly dismissed this claim at the first stage. The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A defendant's sentence is in violation of the proportionate penalties clause where the penalty imposed is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 67. The supreme court has long upheld the constitutionality of mandatory firearm enhancements under the proportionate penalties clause, finding that in fixing a penalty for an offense, the potential for rehabilitation need not be given greater weight or consideration than the seriousness of the offense. *People v. Sharpe*, 216 Ill. 2d 481, 525 (2005). The *Sharpe* court specifically concluded that the enhanced sentences reflected the legislature's intent to address the serious concern over the use of firearms during the commission of felonies. *Id.* at 525-26. The supreme court further observed that the "legislature did not make the enhancements applicable to all defendants who commit felonies with firearms, but only those who commit some of the most serious felonies," such as first degree murder and attempted first degree murder. *Id.* at 526. Since the supreme court has long held that the firearm enhancements do not violate the proportionate penalties clause, defendant's sentencing claim lacks merit and appellate counsel was not ineffective for failing to raise this nonmeritorious claim on direct appeal.

¶ 73    Since we have concluded that defendant's underlying issues lack merit, defendant cannot show that he was arguably prejudiced by counsel's failure to raise these claims on appeal. *People*

28

*v. Easley*, 192 Ill. 2d 307, 329 (2000). Accordingly, defendant's claim of ineffective assistance of appellate counsel fails and the trial court properly dismissed defendant's postconviction petition at the first stage.

¶ 74   Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 75   Affirmed.